REGAN McCARTHY[1] *vs.* SLADE ASSOCIATES, INC., & another[2]
(and two companion cases[3]).

Barnstable. April 2, 2012. - August 10, 2012.

Present: IRELAND, C.J., SPINA, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Practice, Civil,* Discovery, Waiver. *Privileged Communication. Waiver.*
*Evidence,* Privileged communication. *Attorney at Law,* Attorney-client
relationship, Work product.

In civil actions brought against attorneys and land surveyors who allegedly
failed to inform the plaintiff that a parcel of land she purchased more than
twenty years ago was not in fact the parcel she believed she was purchas-
ing, and in which, in deciding a motion to dismiss on the grounds that the
claims were time barred, a Superior Court judge had concluded that the
plaintiff had invoked the discovery rule by alleging sufficient facts sug-
gesting that her cause of action accrued years later when the opposing at-
torney in a Land Court action furnished her with a report evincing the
defect, the defendants were not entitled, under a theory of "at issue"
waiver, to discovery from the plaintiff's attorney in the Land Court action
of communications protected by the attorney-client privilege, where the
defendants failed to meet their burden of showing that the privileged
information sought to be discovered was not available from any other
source [190-193]; however, the defendants were entitled to discover
requested information that qualified as "fact" work product of the at-
torney's law firm, where the defendants had shown a substantial need for
the material and could not, without undue hardship, obtain it from another
source [193-201].
No abuse of discretion arose in a Superior Court judge's not considering
certain discovery requests in his order of discovery, where the order was
not intended to serve as the final definition of the discovery the defendants
would be entitled to obtain. [201-203]

CIVIL ACTIONS commenced in the Superior Court Department

[1]A single justice in the Appeals Court granted a motion of Burns & Levinson
LLP and Alan E. Lipkind (collectively, B&L) to intervene in support of the
plaintiff.

[2]Chester N. Lay. A judge in the Superior Court dismissed all counts against
Richard F. Lay, and he is not a party to these appeals.

[3]Regan McCarthy *vs.* Seamen's Savings Bank & another; Christopher
Snow, third-party defendant; and Regan McCarthy *vs.* Christopher Snow.

on November 20, 2006; January 11, 2008; and August 7, 2008, respectively.

After consolidation, motions for discovery and for sanctions were heard by *Christopher J. Muse*, J.

Leave to prosecute an interlocutory appeal was allowed in the Appeals Court by *Mark V. Green*, J. The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Thomas M. Elcock* for Regan McCarthy.

*Robert J. Muldoon, Jr.* (*Matthew C. Moschella* with him) for Burns & Levinson LLP & another.

*Richard A. Oetheimer* (*Allison Wannop* with him) for Seamen's Savings Bank.

*Benjamin E. Zehnder* for Slade Associates, Inc., & another.

*Michael P. Roche*, for Lester J. Murphy, was present but did not argue.

*Marissa I. Delinks*, for Christopher J. Snow, was present but did not argue.

BOTSFORD, J. We consider here the validity of a discovery order premised on a theory of implicit or "at issue" waiver of protection for otherwise privileged or confidential information. Before the court are cross appeals in three consolidated cases pending in the Superior Court. In the underlying cases, the plaintiff Regan McCarthy has sued various parties, including attorneys and land surveyors, who, she alleges, failed to inform her that a parcel of land she purchased in Truro more than twenty years ago was not in fact the parcel that she believed she was purchasing, causing injury to her in a number of ways. The challenged discovery order required McCarthy's attorneys in a separate Land Court action, Alan E. Lipkind and Burns & Levinson LLP (collectively, B&L), to produce documents from that proceeding and required Lipkind to answer specified questions in writing.

McCarthy and B&L argue that the discovery order improperly required them to produce discovery protected by both the attorney-client privilege and the work product doctrine. The various defendants argue that the discovery order was proper, and in fact should have been broader. For the reasons discussed below, we conclude that at the present time the defendants have

not shown entitlement to discovery of communications protected by the attorney-client privilege under a theory of at issue waiver, but may discover the other requested information that qualifies as "fact" work product from B&L pursuant to Mass. R. Civ. P. 26 (b) (3), 365 Mass. 772 (1974), because the defendants have shown a substantial need for the material and cannot without undue hardship obtain it from another source.

1. *Background.* We summarize a long set of background facts based on the allegations in McCarthy's three Superior Court complaints and associated documents.[4]

a. *McCarthy's 1990 purchase of land in Truro.* For a number of years, McCarthy vacationed on a property (McDermott property) on Higgins Hollow Road in Truro that was owned by Ellen and Robert McDermott and Mikhail Zakin (collectively, McDermotts). In 1990, McCarthy submitted the highest bid for a parcel of land in Truro at a mortgage foreclosure sale advertised and conducted by one of the defendants, Seamen's Savings Bank (Seamen's), which was the mortgage holder. The advertisement stated in part that the parcel would be sold "near the premises, at the end of the paved portion of Higgins Hollow Road, Truro, Massachusetts." McCarthy obtained a mortgage from Seamen's to fund the purchase of the parcel, and retained another of the defendants, Christopher Snow, an attorney, to represent her in connection with it. Before the closing, Snow retained Charles Rogers, a title examiner, to conduct a title search with respect to the parcel as it was described in Seamen's notice of the foreclosure sale.[5] Snow subsequently issued to Seamen's a certificate of title, of which McCarthy received a copy. The foreclosure deed and mortgage to the parcel that McCarthy received from Seamen's were recorded in the Barnstable County registry of deeds on July 3, 1990.

McCarthy purchased this parcel from Seamen's under the belief that it lay to the south of Higgins Hollow Road and abutted the eastern boundary of the McDermott property on which she had vacationed. All the parties now agree, however, that the parcel purchased by McCarthy in 1990 is the parcel described

---

[4]Additional facts are included in the discussion, *infra.*

[5]Charles Rogers is not a party to any of the Superior Court actions.

in a 1911 source deed from Joseph F. Morris and others to James Morris (1911 source deed); this parcel is referred to by the parties and in this opinion as "parcel 2." Parcel 2 does not abut the McDermott property to the east; rather, the abutting property on the east is a separate parcel described in the 1911 source deed and referred to by the parties and in this opinion as "parcel 5."

b. *McCarthy retains various professionals.* As recited, Mc-Carthy hired Snow to represent her in connection with the closing on her purchase of parcel 2 from Seamen's in 1990. In her Superior Court complaint against him, McCarthy alleges that Snow knew that McCarthy believed the parcel abutted the Mc-Dermott property to the east, but despite having knowledge of or access to information indicating that parcel 2 was not located where McCarthy thought it was, failed to disclose to McCarthy that there was any question regarding the location of or title to parcel 2, and failed to recommend that she further investigate the parcel's location or obtain a survey before closing on the purchase. With respect to Seamen's, McCarthy alleges that bank personnel made various representations to her that the parcel she purchased in 1990 was located to the east of and abutted the McDermott property.

Also in 1990, McCarthy first engaged the defendant Chester N. Lay and his company, Slade Associates, Inc. (collectively, Slade), when she sought Lay's "opinion regarding the bounds of Parcel 2 and his advice on how to resolve Parcel 2's alleged landlocked status." At some point before 1995 she hired Slade to stake the corners of her lot, during which time Lay represented to her that the McDermott property abutted parcel 2 to the west. Mc-Carthy hired Slade again in 2003 to stake a portion of parcel 2. In her complaint in the Slade action, McCarthy alleges, inter alia, that Slade failed adequately to warn McCarthy that her parcel was not located where she believed it to be, and knew or should have known that parcel 2 did not abut the McDermott property.

In 2003, McCarthy retained the defendant Lester Murphy, an attorney, to provide legal advice as to whether she could obtain access to a public way from what she believed to be her parcel; in 2004, McCarthy retained Murphy again in connection with

her remortgaging parcel 2 through a new mortgage loan from Seamen's. McCarthy alleges that despite having title reports and a relevant deed in his possession indicating that parcel 2 was not located where McCarthy believed it to be, Murphy failed to disclose "any problem with the title or location of Parcel 2 that McCarthy purchased [in 1990] at auction."

c. *Land Court action.* After a dispute arose between McCarthy and the McDermotts regarding a common boundary between the McDermott property and what McCarthy believed to be her parcel, McCarthy filed an action against the McDermotts in the Land Court on October 22, 2004 (Land Court action). In doing so, she was represented by B&L and Lipkind in particular. McCarthy's verified complaint alleged that the McDermotts were trespassing on her parcel, and she sought a declaratory judgment regarding the boundary line, as well as injunctive relief to prevent the McDermotts from obtaining access to what was, she believed at the time, her land. The complaint referred to McCarthy's 1990 deed and attached a copy of it, but also referred to the 1911 source deed — the deed that contained separate descriptions of parcels 2 and 5.

On January 27, 2005, counsel for the McDermotts filed a title report with the Land Court that revealed to McCarthy, allegedly for the first time, that she did not hold title to the property off Higgins Hollow Road to the east of the McDermott property, but that the parcel directly abutting the McDermott property to the east was parcel 5, and parcel 2 itself was located entirely within the Cape Cod National Seashore. On learning that she did not own parcel 5, McCarthy purchased that parcel in April, 2005, and proceeded with her Land Court action.[6]

d. *Superior Court actions.* McCarthy subsequently filed the three separate actions in the Superior Court before us here. The gist of each complaint is either that the various defendants negligently (and erroneously) determined that parcel 2 directly abutted the McDermott property to the east, that the defendants negligently misrepresented to her that this parcel abutted the McDermott property to the east, or both. More particularly, in

---

[6]The Land Court action went to trial in 2008, and on August 2, 2010, judgment entered for the McDermotts on the boundary dispute. McCarthy's appeal from the judgment was entered in the Appeals Court on February 13, 2012.

November, 2006, McCarthy filed a complaint against Slade (Slade action), alleging negligence, breach of contract, negligent misrepresentation, and violation of G. L. c. 93A; on January 11, 2008, she filed suit against Seamen's and Murphy (Seamen's and Murphy action), alleging negligence, breach of contract, negligent misrepresentation, and violation of G. L. c. 93A by Seamen's, and professional malpractice and violation of G. L. c. 93A by Murphy; and on August 7, 2008, following the end of a tolling agreement, McCarthy filed the third action against Snow (Snow action), also with claims of professional malpractice, negligent misrepresentation, and violation of G. L. c. 93A.[7] McCarthy seeks from each of the defendants various categories of damages, including the cost of purchasing parcel 2 and related mortgage payments, the attorney's fees and costs associated with the Land Court action, and emotional distress damages.

Seamen's, Murphy, and Snow each filed motions to dismiss in their respective actions, essentially arguing that McCarthy's claims were time barred under the relevant statutes of limitations, because the gravamen of McCarthy's claims related to a purchase of property in 1990. On March 17, 2009, a Superior Court judge denied the motions on the ground that McCarthy's complaints against these defendants adequately invoked the discovery rule[8] because the complaints alleged sufficient facts "suggesting that her cause of action accrued in [late] January of 2005 when the opposing attorney in the Land Court litigation furnished her with a report evincing the defect."

e. *Discovery.* Slade deposed McCarthy in November of 2007 solely in connection with the Slade action. Commencing in December of 2007 through 2010, the defendants in all three actions separately sought discovery from B&L on the ground that the discovery was necessary in relation to their defenses.[9] Specifically, first Slade and later the remaining defendants requested to

---

[7]Presumably because of the tolling agreement, the parties treat the action against Christopher Snow as being filed as of the same date — January 11, 2008 — as her suit against Seamen's and Lester Murphy for statute of limitations purposes. Following their lead, we do as well.

[8]The discovery rule provides that a cause of action accrues when the "plaintiff learns, or reasonably should have learned, that [s]he has been harmed by the defendant's conduct." *Franklin* v. *Albert*, 381 Mass. 611, 619 (1980).

[9]As discussed, see note 17, *infra*, the defenses at issue include a statute of

depose Lipkind as well as the production by B&L of documents from the Land Court action, including time sheets; correspondence between or among McCarthy and her attorneys, land surveyors, title abstractors, and title examiners; and any and all documents concerning parcels 2 and 5. B&L filed timely objections to all these requests, arguing that all the document discovery sought was protected by the attorney-client privilege and the work product doctrine,[10] and raised objections as well to the requested depositions. After lengthy wrangling by motion, Lipkind was deposed on November 18, 2009, but only by the Slade defendants in connection with the Slade action.[11] In the course of the deposition, Lipkind declined to answer certain questions, raising the attorney-client privilege and work product protection as grounds; on March 6, 2010, the Slade defendants filed a motion for an order compelling answers to these deposition questions. At some point, B&L produced various documents relating to McCarthy's Land Court action, while withholding certain documents that B&L asserted were protected by the attorney-client privilege and the work product doctrine.

In July, 2010, a Superior Court judge (motion judge) held an omnibus hearing on the various discovery motions in each of the three actions,[12] and thereafter issued the memorandum and order that is the subject of these cross appeals.

f. *Appeals.* On September 23, 2010, McCarthy filed a petition

limitations defense on the part of Seamen's, Murphy, and Snow; and defenses of comparative negligence and intervening negligence on the part of Slade.

[10]B&L also lodged several other objections, including that the requests were burdensome, overbroad, costly, and untimely, and that they sought irrelevant documents.

[11]At the time of Lipkind's deposition, McCarthy's action against Slade apparently was not being litigated in tandem with the other two cases, which had been consolidated with each other in July, 2009. The Slade action was not consolidated with the other cases until September 30, 2010. McCarthy states in her brief that the defendants have entered into a "joint defense agreement," but the record does not contain any information concerning such an agreement.

[12]This set of 2010 hearings followed a hearing in the Slade case on June 16, 2009, after which a different Superior Court judge allowed Slade's motion to compel attendance at depositions and to provide certain documents. The judge ruled that "[d]iscovery was permitted on a limited basis — what the plaintiffs knew about parcels 2 & 5 and when was it first known; issues relating to billing records and work performed is discoverable so long as it does not involve privileged material or the work product." No appeal was taken from this prior discovery order.

under G. L. c. 231, § 118, first par., in the Appeals Court, seeking review by a single justice of the motion judge's discovery order. That same day, Snow, Seamen's, and Murphy filed a joint petition also seeking a review of the order. The single justice consolidated the petitions and reported them to a panel of that court, and another single justice subsequently allowed B&L's motion to intervene in the appeal. See note 1, *supra*. We then transferred the consolidated appeals to this court on our own motion.

2. *Discussion.* a. *Introduction.* The motion judge, finding that "the defendants have established the relevance of their discovery requests," determined that McCarthy's claims against the various defendants, and their respective defenses, including the statute of limitations, "established the basis for the 'at-issue waiver' ";[13] "the information concerning the title examinations ordered by . . . Lipkind are especially relevant"; the defendants "have established that they have exhausted all potential sources for the information concerning Jane Heatley,"[14] and "thus certain correspondence and communications between her and . . . Lipkind may be produced." The motion judge then ordered Lipkind and B&L to "review and resubmit to the defendants the billing records relating to Jane [Heatley], and her firm's title examination, redacting only information that might constitute impressions or other cognizable work product claims." He also ordered Lipkind to answer in writing the seven questions submitted by Slade.[15] See Appendix. In summary, they asked Lipkind to identify the deeds, plans, and other documents he reviewed before filing the Land Court action; identify the deeds, plans, reports, and other documents provided to him or B&L by Jane Heatley in connection with the representation of

---

[13]The motion judge did not identify what had been waived through an at-issue waiver: the attorney-client privilege, work product protection, or both.

[14]During initial discovery in the Slade action, the Slade defendants received redacted copies of B&L's billing records relating to the Land Court action that included an entry indicating that B&L had retained the services of one "J. Heatley" to conduct "title work" in September, 2004, approximately one month before the complaint in the Land Court action was filed. All the defendants sought production of documents relating to Heatley's title work.

[15]Seamen's, Murphy, and Snow had submitted other proposed questions to be asked of Lipkind, but the motion judge only ordered Lipkind to answer the seven proposed by Slade. See Appendix.

McCarthy (Heatley documents); answer whether McCarthy ever communicated a concern to B&L about whether her parcel abutted the McDermott property before early January, 2005, or vice versa; and identify dates when he first became aware of specific information about the locations of parcels 2 and 5.[16]

On appeal, McCarthy and B&L argue that the motion judge's order erroneously requires B&L and Lipkind individually to disclose information protected by the attorney-client privilege and the work product doctrine because there is no basis for finding an at issue waiver. Not surprisingly, the defendants take the opposite position. Seamen's, Murphy, and Snow contend primarily that this information is relevant to and necessary for their various statute of limitations defenses[17] and McCarthy's invocation of the discovery rule to toll the respective limitations periods established by those statutes.[18] In connection with their cross appeals, these defendants further argue that the discovery order did not go far enough. Slade argues that the information covered by the discovery order is relevant to and necessary for Slade's affirmative defenses of contributory or comparative negligence on the part of McCarthy and intervening causation on the part of B&L,[19] and also for Slade to defend against McCarthy's damages claims.

After a brief recitation of the standard of review, we consider

---

[16]The specific questions are addressed in more detail in parts 2.c and 2.d, *infra.*

[17]At issue are the three-year negligence statute of limitations, see G. L. c. 260, § 2A; the three-year malpractice statute of limitations, see G. L. c. 260, § 4; the four-year statute of limitations applicable to claims brought under G. L. c. 93A, see G. L. c. 260, § 5A; and the six-year statute of limitations applicable to breach of contract actions, see G. L. c. 260, § 2.

[18]B&L represents McCarthy solely in connection with the Land Court action; she is represented by separate counsel in the Superior Court cases. Nevertheless, at oral argument before us, counsel for McCarthy and counsel for B&L both indicated agreement with the proposition that what B&L knew or should have known regarding the location of parcel 2 on or before January 11, 2005, three years before the time McCarthy filed her Superior Court complaint against Seamen's, is imputed to McCarthy for the purpose of considering her reliance on the discovery rule in the Superior Court actions. For the purposes of this opinion, we assume, without deciding, the validity of that proposition.

[19]On appeal, Slade does not make directly any argument based on a statute of limitations defense, but in the brief joins the other defendants' arguments.

the appeals of McCarthy and B&L, beginning with whether there has been an at issue waiver of the attorney-client privilege, and then whether the defendants are entitled to discovery under the work product doctrine. Last, we consider the defendants' arguments that the discovery order was too narrow.

b. *Standard of review*. As a general matter, this court "uphold[s] discovery rulings 'unless the appellant can demonstrate an abuse of discretion that resulted in prejudicial error.' " *Commissioner of Revenue* v. *Comcast Corp.*, 453 Mass. 293, 302 (2009) (*Comcast*), quoting *Buster* v. *George W. Moore, Inc.*, 438 Mass. 635, 653 (2003). However, "[m]ixed questions of law and fact, such as whether there has been a waiver, generally receive de novo review." *Comcast, supra* at 303.[20]

c. *Attorney-client privilege*. The privilege protects communications between a client and an attorney that are made in confidence for the purpose of giving or obtaining legal advice. See Mass. G. Evid. § 502(b) (2012). See also *Comcast*, 453 Mass. at 303.[21] Although the privilege is held and may be claimed by

[20]See 2 P.R. Rice, Attorney-Client Privilege in the United States § 11.38, at 1158-1159 (2011) (Rice) ("Questions of law [e.g., the elements of the privilege, its exceptions and how each is defined; the scope of the privilege; and the standards of waiver] are subject to plenary review — a full or complete review under a nondeferential de novo standard. Therefore, the determination of what the facts are, is reviewed by the relaxed abuse of discretion standard, while the definition of the law and the application of those facts to the law [whether there has been compliance with the legal standard] is reviewed without deference to the trial court").

[21]In the *Comcast* case, we indorsed Professor Wigmore's "classic formulation" of the attorney-client privilege, set out in 8 J. Wigmore, Evidence § 2292 (McNaughton rev. ed. 1961), which perhaps might be read to be limited to communications from the client to the attorney, and not to include communications in the reverse direction. *Commissioner of Revenue* v. *Comcast Corp.*, 453 Mass. 293, 30 (2009) (*Comcast*). We accept that the appropriate statement of the privilege is the broader formulation set out in the text, one that protects confidential communications between client and attorney for the purpose of both obtaining and giving legal advice. See 1 E.S. Epstein, The Attorney-Client Privilege and the Work-Product Doctrine 9 (5th ed. 2007) ("At one time the privilege tended to protect only communications from the client to the lawyer. That is no longer the case. Now the privilege protects communications from the client to the lawyer and from the lawyer to the client"). See also *Upjohn Co.* v. *United States*, 449 U.S. 383, 390 (1981) (attorney-client privilege "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice").

the client, an attorney "is presumed to have authority to claim the privilege but only on behalf of the client." Mass. G. Evid., *supra* at § 502(c).

The attorney-client privilege is subject to waiver. See generally 1 P.R. Rice, Attorney-Client Privilege in the United States § 2.2, at 52-53 (2011) ("assuming a limited number of exceptions are not applicable, [the] protection [afforded by the privilege] is absolute. . . . Absent a waiver of the protection . . . the privilege precludes the disclosure of the communications regardless of the need that might be demonstrated for the information in them"). In *Darius* v. *Boston*, 433 Mass. 274 (2001) (*Darius*), this court recognized the premise of a limited, at issue waiver, stating, "We accept, as a general principle, that a litigant may implicitly waive the attorney-client privilege, at least partly, by injecting certain claims or defenses into a case." *Id.* at 277. However, in *Darius* itself, we declined to find an at issue waiver of the attorney-client privilege for a number of reasons, including that the discovery sought by the defendant was excessively broad both temporally and in scope. *Id.* at 279-280, 282-283. Accordingly, we had no occasion to formulate a precise definition of at issue waiver.[22]

Nonetheless, our decision in *Darius*, 433 Mass. at 280, was clear that where a defendant raises a statute of limitations defense that is met by the plaintiff's reliance on the discovery rule, the statute of limitations invocation, by itself, does not permit the defendant to intrude into the attorney-client relationship between the plaintiff and her lawyer only to locate a statement by the client that might contradict a statement or position that she has taken in the particular case.[23] Nor, more generally, does it allow such an intrusion "simply to determine whether

---

[22]We noted in *Darius* v. *Boston*, 433 Mass. 274 (2001) (*Darius*), that the premise of an at issue waiver of the attorney-client privilege had been accepted by State and Federal courts throughout the United States, including the United States Court of Appeals for the First Circuit, and that many courts had adopted a version of the formulation provided in *Hearn* v. *Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975), although that formulation had a number of critics. See *Darius*, *supra* at 277-279, and cases and authorities cited.

[23]We stated the following in *Darius*, 433 Mass. at 280: "The only reason we can see for the [defendant's] attempting to obtain [the] information from present counsel is to test the credibility of the plaintiffs — in other words, to see whether the plaintiffs confided to their counsel anything that contradicted

the plaintiff may have revealed something to . . . her attorneys that might be helpful to the defendant[s'] case." *Id.* at 282. In addition, we cautioned in *Darius* that "there can be no 'at issue' waiver [of the attorney-client privilege] unless it is shown that the privileged information sought to be discovered is not available from any other source." *Id.* at 284, and cases cited. See *Global Investors Agent Corp.* v. *National Fire Ins. Co.*, 76 Mass. App. Ct. 812, 817-818 (2010).

In this case, we continue to recognize the concept of an at issue waiver of the attorney-client privilege, and, like a number of other courts, accept in general the premise that such a waiver might come into play where a statute of limitations defense is met by the plaintiff's reliance on the discovery rule. See, e.g., *Pyramid Controls, Inc.* v. *Siemens Indus. Automations, Inc.*, 176 F.R.D. 269, 274-275 (N.D. Ill. 1997); *Connell* v. *Bernstein-Macaulay, Inc.*, 407 F. Supp. 420, 423 (S.D.N.Y. 1976); *Lama* v. *Preskill*, 353 Ill. App. 3d 300, 306-307 (2004); *League* v. *Vanice*, 221 Neb. 34, 44-46 (1985); *Wardleigh* v. *Second Judicial Dist. Court of Nev.*, 111 Nev. 345, 356-357 (1995). See also *Conkling* v. *Turner*, 883 F.2d 431, 434-435 (5th Cir. 1989), and cases cited.[24] However, the defendants here have failed to show, as they must, that the "the privileged information sought to be discovered is not available from any other source." *Darius*, 433 Mass. at 284. With the exception of Slade — who is in a somewhat different position — the defendants have not deposed McCarthy regarding her knowledge of facts concerning the location of the correct parcel and when she acquired that knowledge; have not, at least as indicated in the record, sought

their assertion that they did not know of a causal connection before being informed of it by counsel. We shall not allow the [defendant] to pit counsel against their clients in that fashion."

[24]In *Darius*, 433 Mass. at 282, we indicated that on the particular facts of that case, we would not follow *Conkling* v. *Turner*, 883 F.2d 431 (5th Cir. 1989), insofar as the court's decision there might be interpreted to permit penetration of the attorney-client privilege on an at issue waiver theory simply to test the credibility of the plaintiff. We did not indicate any disagreement with the more general premise of the decision, see *id.* at 434, that the attorney-client privilege may be waived when the client puts in issue information that otherwise would be protected by the privilege — such as information relating to when the plaintiff client knew certain facts that are directly relevant to the defendant's statute of limitations defense.

discovery of title examination reports or other related documents that might not be subject to any privilege; and, most particularly, as we discuss *infra*, have not conducted discovery of documents and materials that are not covered by the attorney-client privilege, but qualify as work product protected under the work product doctrine.[25]

The seven questions Lipkind has been ordered to answer include two that directly implicate the attorney-client privilege.[26] The defendants have not shown that the information they permissibly seek is not otherwise available. Therefore, they are not entitled — certainly at this time, and perhaps at any time, see *Darius*, 433 Mass. at 280 — to answers from Lipkind to question 4 (inquiring whether McCarthy, or any person acting on her behalf, prior to a particular date, ever communicated to Lipkind or B&L a concern that the parcel might not abut the McDermott property) or question 5 (inquiring whether Lipkind or B&L, prior to a particular date, ever communicated to McCarthy or any person on her behalf, a concern that the parcel might not abut the McDermott property).[27] See Appendix.

d. *Work product doctrine.* In the recent *Comcast* case, we

[25]We conclude that the defendants must seek discovery of materials subject to work product protection before being permitted to penetrate the attorney-client privilege because of the different nature of the work product doctrine and the attorney-client privilege. As indicated in the text, the protection afforded by the privilege, while subject to waiver, is by nature absolute in order to fulfil its purpose. See 1 Rice, *supra* at § 2.2, at 52 (protections of privilege are absolute "in order to further the privilege's end — encouraging candor and full disclosure by the client. If the protection were not absolute, it would not be predictable, and the client could not rely on it"). In contrast, the work product doctrine offers only qualified protection of the materials it covers. See *Comcast*, 453 Mass. at 314-315. That is, as we discuss in part 2.d, *infra*, the doctrine has an exception built into it, namely, that with respect to at least ordinary (fact) work product, it is discoverable so long as the party seeking the discovery demonstrates a substantial need and an inability, without "undue hardship," to obtain the same information by other means. See Mass. R. Civ. P. 26 (b) (3), 365 Mass. 772 (1974).

[26]The motion judge's order covers some documents as well as the seven questions, but the documents ordered produced implicate the work product doctrine more than the attorney-client privilege. See Appendix. We discuss these documents in part 2.d, *infra*, and in that context consider application of the attorney-client privilege to them.

[27]Question 3 (inquiring whether any of the documents provided to B&L by Jane Heatley [Heatley documents] had been given to McCarthy, and if so, which ones and when), in our view, does not call for a response that implicates

described the origins and purposes served by the work product doctrine. See *Comcast*, 453 Mass. at 311-312. See also *Ward* v. *Peabody*, 380 Mass. 805, 817 (1980) (work product doctrine is "intended to enhance the vitality of an adversary system of litigation by insulating counsel's work from intrusions, inferences, or borrowings by other parties as [counsel] prepares for the contest"). The work product doctrine is codified in Mass. R. Civ. P. 26 (b) (3), which protects (1) "documents and tangible things," (2) "by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent)," and (3) "in anticipation of litigation or for trial." See generally P.M. Lauriat, S.E. McChesney, W.H. Gordon, & A.A. Rainer, Discovery § 4:5 (2d ed. 2008 & Supp. 2011).

Work product shielded by the doctrine is not privileged, but instead "is given qualified protection from discovery as a concession to the necessities of the adversary system." 1 D.M. Greenwald, E.F. Malone, & R.R. Stauffer, Testimonial Privileges § 2:1, at 2-3 to 2-4 (2005). Thus, rule 26 (b) (3) provides as follows:

> "[A] party may obtain discovery of documents and tangible things . . . [qualifying as work product materials] only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case *and* that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." (Emphasis added.)[28]

---

the attorney-client privilege. The question only asks Lipkind to identify dates and specific Heatley documents; it does not call for the identification or production of any cover letter or message conveying Lipkind's or any other B&L attorney's thoughts or comments or theories relating to those documents. See Appendix.

On the other hand, as we later discuss, one aspect of question 7 (inquiring into the timing and source of Lipkind's knowledge concerning the location of the McCarthy parcel relative to the McDermott property) might perhaps be read to call for the disclosure of communications within the scope of the attorney-client privilege, and to that extent, Lipkind may decline to respond at this time. See note 42, *infra*.

[28]As the final quoted sentence of the rule indicates, rule 26 (b) (3) provides

The qualifications in the rule speak, albeit more generally, to the concerns addressed by the concept of at issue waiver of the attorney-client privilege, that is, concerns about fairness where the party asserting the privilege affirmatively raises a claim or defense that makes information protected by the privilege material and relevant to the case and the particular information is "vital" to the opposing party. See *Hearn* v. *Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975).[29] Indeed, a number of courts have adopted and applied the *Hearn* v. *Rhay* formulation of at issue waiver of the attorney-client privilege to analyze discovery requests for work product. See, e.g., *Tennison* v. *City & County of San Francisco*, 226 F.R.D. 615, 622-623 (N.D. Cal. 2005) (*Tennison*). At least in the present case, however, our established work product doctrine, set out in rule 26 (b) (3), already provides a satisfactory analytical framework within which to consider the matter, and it is the framework we use.

Under the rule, the first question is whether the defendants have made the requisite showing that they have "substantial need" of the materials qualifying as work product that are covered by the motion judge's discovery order. We conclude that they have. McCarthy's injection of the discovery rule into these cases puts in play the state of her knowledge about the location of parcel 2, purchased by her in 1990. Cf. *Madanes* v. *Madanes*, 199 F.R.D. 135, 150 (S.D.N.Y. 2001) ("substantial need" shown where "the work product material at issue is central to the substantive claims in litigation"). That is, if McCarthy knew or reasonably should have known that parcel 2 did not abut the McDermott property at the time she filed the Land Court action on October 22, 2004, or in any event before January 11, 2005 (i.e., three years before she initiated the present Superior Court suits against the defendants other than Slade [see note 7, *supra*]), the discovery rule would not protect her from the defendants' statute of limitations and perhaps comparative negligence

---

greater protection for so-called "opinion" work product than ordinary or "fact" work product. See *Comcast*, 453 Mass. at 314-315.

[29]See also *Greater Newburyport Clamshell Alliance* v. *Public Serv. Co. of N.H.*, 838 F.2d 13, 20 (1st Cir. 1988) (in civil damages action, attorney-client privilege gives way where defendant can show that plaintiff's claim "and the probable defenses thereto, are enmeshed in important evidence that will be unavailable to the defendant if the privilege prevails").

defenses. Conversely, if McCarthy did not know or reasonably should not have known about the actual location of parcel 2, the opposite would be true. See *Hendrickson* v. *Sears*, 365 Mass. 83, 91 (1974) (client's cause of action against attorney for negligent certification of title to real estate does not accrue until negligent misrepresentation is discovered or reasonably should have been discovered). See also *Friedman* v. *Jablonski*, 371 Mass. 482, 485-486 (1976), and cases cited. The knowledge of B&L concerning the actual location of McCarthy's parcel at these same times also is directly relevant, see note 18, *supra*, because the knowledge of the client's attorney is generally imputed to the client. See *Friedman* v. *Jablonski*, *supra* at 486. See also *Levin* v. *Berley*, 728 F.2d 551, 552-553 (1st Cir. 1984), and cases cited (applying Massachusetts law).[30]

The discovery order at issue directed B&L to produce certain documents, and further directed Lipkind to answer specific questions in writing. Considering first the documents, the order states that "certain correspondence and communications between [Heatley] and attorney Lipkind may be produced" and that "Lipkind, and by necessary implication, [B&L] . . . shall further review and resubmit to the defendants the billing records relating to [Heatley], and her firm's title examination, redacting only that information which might constitute impressions or other cognizable work product claims."[31] We agree with the

[30]Cf. *Tennison* v. *City & County of San Francisco*, 226 F.R.D. 615, 622-623 (N.D. Cal. 2005) (*Tennison*) (in asserting in his civil action brought under 42 U.S.C. § 1983 that government defendants violated his constitutional rights by not disclosing exculpatory evidence in prior criminal case against him, plaintiff would need to prove his own and his criminal trial attorney's lack of knowledge of exculpatory evidence before criminal trial took place; accordingly, state of plaintiff's and attorney's knowledge at pertinent time was directly relevant and justified finding of at issue waiver of work product protection).

[31]The motion judge's proviso permitting the redaction of "information which might constitute impressions or other cognizable work product claims" is confusing. All B&L's billing records relating to Heatley, as well as any title examination or other report prepared by Heatley or her firm, would appear to qualify as "cognizable work product," and therefore, B&L would not be required to produce anything — a result the judge clearly did not intend. Given the reference to "impressions," it seems likely the judge intended to authorize redaction only of the portions of these documents that would qualify as opinion as opposed to fact work product (see note 28, *supra*); in any event, that is the way we will interpret the order.

motion judge that the defendants are entitled to discover the fact or ordinary work product contents of the billing records; they also are entitled to discovery of any title examination or report prepared by Heatley and her firm on behalf of B&L in relation to the Land Court action.[32] We infer from the record that Heatley was retained by Lipkind in connection with issues relating to the title and boundaries of McCarthy's parcel and the McDermott property, presumably in connection with McCarthy's dispute and subsequent lawsuit against the McDermotts.[33] Accordingly, one might anticipate that the Heatley billing records and title examination documents would be relevant to determining what B&L knew or reasonably should have known about the specific location of McCarthy's parcel 2.

B&L asserts in conclusory fashion that all the document discovery ordered by the motion judge — including, therefore, the billing records and all the Heatley records — qualifies as opinion work product, and under this court's opinion in *Comcast*, 453 Mass. at 314-315, perhaps is not discoverable at all, but certainly not without meeting a standard of "highly persuasive" rather than simply one of "substantial need." We disagree. We have not reviewed the bills in question, but as a general proposition, billing records are just that — records of amounts being billed to a particular client for services rendered and, presumably, a description of those services, the identity of

---

[32]The parties, through various motions submitted to this court, take opposite positions on the meaning of the following provision in the discovery order: "[Lipkind and B&L are to] review and resubmit to the defendants *the billing records relating to Jane [Heatley], and her firm's title examination*" (emphasis supplied). We find the language ambiguous: does it order B&L to produce simply the billing records relating *only* to Heatley and her firm's title examination; or does the order require B&L to produce *all* its billing records relating to Heatley, *as well as* Heatley and her firm's title examination in whatever form that might exist? Read in the context of the motion judge's entire order, however, we think the ambiguity is best resolved by interpreting the quoted language to require the production of all billing records relating to Heatley as well as any title examination produced by Heatley or her firm, and not merely the billing records relating to that title examination. In any event, for reasons we discuss in the text, we conclude that the defendants are entitled to production of both the billing records and any title examination, with redactions for true opinion work product.

[33]We reject the argument advanced by Murphy and Seamen's that the plaintiffs did not meet their burden of showing that Heatley's work was done in anticipation of litigation against the McDermotts.

those who rendered them and the time they each spent in doing so, and actual costs incurred. This is usually the stuff of fact, not opinion. To the extent that a particular description of services in one or more of the bills might contain substantive references to privileged attorney-client communications, these entries may be redacted by the motion judge.[34] It is not likely that the billing records will contain entries that implicate an attorney's or expert's "mental impressions, conclusions, opinions, or legal theories," Mass. R. Civ. P. 26 (b) (3), but if they do, pursuant to the terms of the judge's discovery order, these entries also may be redacted.[35]

With respect to any title examination by Heatley, we assume[36] that it might contain descriptions of and factual information about title records pertinent to both parcels 2 and 5, perhaps physical markers located on parcel 5, and similar information relating to the McDermott property. None of this would be opinion work product (although information about the McDermott property does not appear relevant to the question of B&L's and McCarthy's knowledge about the location of parcel 2). It is possible, however, that a Heatley report also contains impressions, opinions, and conclusions of its authors, including, presumably, Heatley. While these would qualify as opinion work product, see, e.g., *Sprague* v. *Director, Office of Workers' Compensation Programs*, 688 F.2d 862, 870 (1st Cir. 1982), the "opinions" presumably relate to issues material to the Land Court action, which has focused on the relationship between parcel 5 and the McDermott property.[37] The defendants in the Superior Court cases would not appear to have any need for this

---

[34]On remand, it would be helpful if the judge conducted a review of the billing records in camera in connection with any redactions proposed by B&L. Preparation of a privilege log by B&L, identifying those documents claimed to be protected by the attorney-client privilege and those protected as work product, also would be appropriate.

[35]As earlier indicated, see note 31, *supra*, the motion judge's order appears to permit redaction of true opinion work product. The defendants do not challenge this ruling, although Snow — mistakenly in our view — appears to claim that the motion judge allowed discovery of opinion work product.

[36]The record does not contain any of the documents or materials that are the subject of the motion judge's discovery order, and therefore we have not reviewed them.

[37]That opinion work product relates to a different case does not mean that it

material, much less a compelling need; again, redaction would appear appropriate.[38]

We also take the view that the defendants satisfy the second condition under rule 26 (b) (3) for obtaining the work product ordered by the motion judge, namely, that they are "unable without undue hardship to obtain the substantial equivalent of the materials by other means." Although B&L suggests that the defendants can simply examine title and other documents on record in the Barnstable County registry of deeds or available from other public sources to find information relating to the actual location of parcel 2, the suggestion misses the point. The focus of the defendants' inquiry is what McCarthy and B&L knew or reasonably should have known about the parcel's location at the time the Superior Court actions were filed. The public document review suggested by B&L might assist the defendants on the objective, "should have known" prong of the necessary knowledge inquiry, but it is not going to touch on the separate prong of subjective or actual knowledge; the defendants are entitled to information concerning both prongs and there is not another source that will similarly focus on the knowledge of B&L and, to some extent, McCarthy. See *Ward* v. *Peabody*, 380 Mass. at 818, and cases cited (discussing why certain documents constituting work product were discoverable: "[A]s far as appears neither the papers nor their substantial

no longer qualifies as work product. See, e.g., *Planalto* v. *Ohio Cas. Ins. Co.*, 256 F.R.D. 16, 19 (D. Me. 2009) (documents protected by work product doctrine may continue to be so protected in later action); *In re Grand Jury Subpoena*, 220 F.R.D. 130, 150 (D. Mass. 2004), quoting 8 C.A. Wright, A.R. Miller, & R.L. Marcus, Federal Practice and Procedure § 2024 (2d ed. 1994) (protections of work product doctrine extend to subsequent litigation, even if it is "unrelated," but, "[t]o the extent that the rule seems to give undue protection to material prepared for some other suit the court can . . . view tolerantly the showing necessary to overcome the work product immunity"). See also 1 D.M. Greenwald, E.F. Malone, & R.R. Stauffer, Testimonial Privileges § 2:13 (3d ed. 2005).

[38]The need to protect opinion work product that is directly relevant to the issues in dispute in the separate Land Court litigation might be especially acute because an appeal from the Land Court decision is currently under consideration in the Appeals Court. See note 6, *supra*. We do not consider here whether the same degree of protection should be afforded to material in a Heatley title examination or report that might perhaps qualify as opinion work product material but focuses specifically on the location of parcel 2 in relation to the McDermott property. See *In re Grand Jury Subpoena*, 220 F.R.D. at 150.

equivalents are available from another source. These are factors often held to be favorable to requiring production").

Moreover, McCarthy and Lipkind have each testified in depositions conducted by Slade that they did not know before late January, 2005 — when the McDermotts' title report was filed in the Land Court — that McCarthy's parcel did not abut the McDermott property. The title and related documents that B&L and perhaps McCarthy[39] had in their possession and actually reviewed in connection with bringing the Land Court action offer a meaningful source of information by which the defendants might test these statements of knowledge, and there is no other source available for them. See *Tennison*, 226 F.R.D. at 622 (discussing importance of documents in examining witnesses and pointing out that discovery under rules of civil procedure "affords litigants an array of tools which are often complementary; documents and depositions are two such complementary tools").[40]

We turn to the questions that the motion judge ordered Lipkind to answer in writing.[41] Question 1 asks Lipkind to identify every deed, instrument, or other document he reviewed to determine the ownership of McCarthy's parcel 2 before filing the Land Court action; question 2 inquires about every document (e.g., invoice, deed, plan, report) provided to B&L by Heatley before January 26, 2005; and question 3 asks about Heatley documents Lipkind might have provided to McCarthy. For the reasons just discussed in connection with the documents the judge ordered produced, we conclude that these questions (1) ask for information directly relevant to B&L's and McCarthy's level of knowledge about the actual location of parcel 2, and (2) are not available from any other source. Thus, the defendants have a substantial need of Lipkind's answers, and

---

[39]The third of the seven questions that Lipkind has been ordered to answer asks about documents sent by B&L to McCarthy. See Appendix.

[40]It also does not appear that the defendants have any way of obtaining any title examination or other report and related documents that Heatley might have prepared or reviewed except through B&L. Heatley is not a party to the Superior Court actions, and information in the record indicates that she might not be available to be deposed because she no longer lives in Massachusetts.

[41]Previously, we concluded that Lipkind should not be required to answer questions 4 and 5 on grounds of unwaived attorney-client privilege. See part 2.c, *supra.* We focus here on the other questions.

they cannot obtain the equivalent without "undue hardship." Lipkind properly may be required to answer them.

As it did with respect to the documents, B&L asserts that these questions ask for opinion work product. Again, the claim fails. Simply identifying what documents an attorney reviewed, what documents were provided by a consultant, or what documents were provided to the client, in each instance without any requirement to describe content, reveals nothing about the attorney's (or the consultant's or the client's) opinion or impression of any of the documents, or any conclusions the attorney (or consultant or client) drew from them. See *Bamberg* v. *KPMG LLP*, 219 F.R.D. 33, 36 (D. Mass. 2003), citing *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1015 1018 (1st Cir. 1988) (information concerning attorney's identification and selection of documents ordinarily falls "within the 'less-shielded category' of 'ordinary' work product but not within the 'highly protected category' of 'opinion' work product").

Question 6 asks Lipkind in substance about his knowledge concerning the location of parcel 5 before filing the Land Court action; question 7 asks Lipkind to identify and describe, respectively, the earliest date and the means by which he "first became aware that the McCarthy parcel [i.e., parcel 2] did not or might not abut the McDermott Property." There is substantial merit to Seamen's argument that Lipkind has expressly waived any claim of work product protection for these questions, given that he testified in his deposition that as of January 25, 2005, he was unaware that McCarthy's parcel did not abut the McDermott property to the east. See *Tennison*, 226 F.R.D. at 620-621. In any event, and again for reasons discussed, Lipkind may be ordered to answer question 6 and at least most of question 7.[42]

e. *Discovery requests of Seamen's, Murphy, and Snow.* The

[42]Question 7 does not directly ask for information that comes within the attorney-client privilege. However, the portion of the question asking Lipkind the "means by which" he first became aware of parcel 2's actual location might be read as inquiring about the source of Lipkind's awareness, and, if so, the response could implicate the privilege (e.g., if Lipkind became aware through a communication from McCarthy). See Appendix. Because we have concluded that the defendants currently are not entitled to discover evidence of communications within the scope of the attorney-client privilege under the rubric of at issue waiver, Lipkind may not be required to respond to any portion of question 7 that might be asking for the source of his awareness.

motion judge did not consider the various specific discovery requests of Seamen's, Murphy, and Snow in his order. Rather, he ordered production of a narrower category of documents than the defendants had sought; adopted only the proposed questions submitted by Slade; and essentially denied without prejudice these three defendants' requests to depose Lipkind. Seamen's, Murphy, and Snow argue in their cross appeals that they are entitled to additional discovery beyond what the motion judge permitted.

We review this aspect of the judge's order for abuse of discretion resulting in prejudicial error. See *Buster* v. *George W. Moore, Inc.*, 438 Mass. at 653, citing *Solimene* v. *B. Grauel & Co.*, 399 Mass. 790, 799 (1987). Discovery in these cases is ongoing. Particularly in light of the judge's offer to revisit the denial of the defendants' requests to depose Lipkind, we do not understand his order as intended to serve as the final definition of the discovery these defendants will be entitled to obtain. In the circumstances, we cannot find an abuse of discretion causing prejudice. However, on remand, there will be further proceedings concerning the discovery requests at issue in these appeals, and in that context we offer the following general observations.

(i) In substance, Seamen's, Murphy, and Snow seek production by B&L, inter alia, of all documents, including billing records, that might bear on the investigation undertaken by B&L before January 11, 2005, to determine the ownership, title, and actual location of parcels 2 and 5; documents actually reviewed by B&L before the same date; and all communications between B&L and anyone who performed any examination or conducted any title search on behalf of B&L in connection with the Land Court action before that date. In light of these defendants' statute of limitations defenses, they appear entitled to this requested discovery, which extends beyond the time frame and the limited scope of the discovery authorized to date.[43]

---

[43]In these particular circumstances, where documents pertaining to another pending lawsuit are at issue, it would be appropriate for the judge to order a privilege log, to conduct a review of the documents in camera, and to order redaction — at least at this point in time — of contents that constitute privileged attorney-client communications or opinion work product, as well as work product irrelevant to the Superior Court actions.

(ii) These defendants seek to require Lipkind to answer additional written questions beyond those suggested by Slade, and to take Lipkind's oral deposition. Again, the questions they propose would expand the time frame addressed in most of the questions approved by the motion judge, which might be appropriate. With respect to Lipkind's deposition, the judge has indicated a continued willingness to consider this request, and we leave it to him to do so.

(iii) Murphy argues that he is entitled to discovery of work product relating to the damages claimed by McCarthy — and particularly, it seems, B&L's bills. To the extent that McCarthy seeks to recover as damages in these cases all the fees she has paid to B&L in connection with the Land Court action, at some point, discovery relating to the bills might be appropriate, but the timing of such discovery is a matter for the motion judge to consider on remand.

3. *Conclusion.* The discovery order dated August 24, 2010, in the three consolidated cases before this court is affirmed in part and reversed in part. The cases are remanded to the Superior Court for proceedings consistent with this opinion.

*So ordered.*

APPENDIX.

## *Statement of Questions*

1.  Please identify by Book and Page, or if not recorded or registered, by description and number of pages, each and every deed, plan, instrument, probate, or other document which you reviewed for the purposes of determining the ownership, location, boundaries and/or access to a public or private road, of the McCarthy Parcel and/or McDermott Property prior to filing the Land Court Case Verified Complaint on or about October 22, 2004.

2.  Please identify by Book and Page, or if not recorded or registered, by description and number of pages each and every document, including invoice, deed, plan, sketch, instrument, probate, report, memo, abstract and/or correspondence provided to you or to any person at Burns & Levinson LLP by Jane W. Heatley a/k/a Jane Mitchell prior to January 26, 2005, in connection with your work for Regan McCarthy ("Heatley Documents").

3.  Did you provide any of the Heatley Documents, identified by your answers to question #2 above, to Regan McCarthy, either directly or indirectly? If so, for each such document, please identify the document, method of provision, and earliest date such provision occurred.

4.  Did Regan McCarthy or any person acting on her behalf ever communicate or express a concern to you or any person at Burns & Levinson prior to January 26, 2005 that the McCarthy Parcel did not or might not abut the McDermott Property? If so, please describe the date, method and substance of each such communication.

5.  Did you or any person acting on your behalf ever communicate or express a concern to Regan McCarthy or to any person acting on her behalf prior to January 26, 2005 that the McCarthy Parcel did not or might not abut the McDermott Property? If so, please describe the date, method and substance of each such communication.

6.  On or about October 22, 2004, did you know that the fifth described parcel in the deed at Book 314, Page 45 formed the eastern boundary of the so-called "Rich Parcel," as the "Rich Parcel" is described in the Land Court Case Verified Complaint at paragraph 9(f) on pages 4-5 and shown on Exhibit 3 of the Verified Complaint?

7.  Please state the earliest date and describe the means by which you first became aware that the McCarthy Parcel did not or might not abut the McDermott Property.